## J. HARRELL v. A. H. BARNES.

1. In 1862 the holder of a promissory note, then due, was ordered by a provost marshal of the so-called Confederate States to receive Confederate Treasury notes tendered in payment by the debtor, and to surrender the note, under penalty of arrest or imprisonment, in case he should refuse. The holder, under these circumstances, surrendered the note and received the Confederate money under protest, and immediately placed the Confederate money in the hands of a third person for safe keeping. *Held*, that such compulsory receipt of treasonable currency had no effect as a payment of or on the note, either in whole or to any extent whatever; and there was no error in rendering judgment against the debtor for the entire principal and interest of the note, regardless of any supposed value attributed to the Confederate money. (Presiding Judge Evans dissented, on grounds set forth in his opinion.)

2. Contracts for the payment of money, entered into before the passage of the legal tender act, had reference to coined money, unless they stipulated otherwise; and they called for payment in coin as specifically as, though it was so expressed on their face.

3. This court defers to the decisions of the United States Supreme Court on questions arising upon the legal tender act of Congress; and following Hepburn v. Griswold, 8 Wallace, 603, this court holds that there was no error in rendering judgment for coin on a note made in April, 1860, and payable two years after date.

4. Note the dissenting opinion of Presiding Judge Evans, on the principal questions presented in this case.

APPEAL from Travis. Tried below before the Hon. J. J. Thornton.

The following statement of the facts of the case is taken from the written argument of the appellant's counsel, but its accuracy is not called in question by the other side, or in the opinion of the court; and it is believed that it is not only correct so far as it goes, but that nothing is omitted which materially affects its version of the case.

As this cause involves important principles of law, and excited an unusual degree of interest, it is reported in full.

The plaintiff Barnes alleged as cause of action that defendant, on March 13, 1860, executed to plaintiff two promissory notes of $1000 each, one due two years after date, the other four years, drawing ten per cent. interest from date and twelve per cent. after maturity, if demand was made. The vendor's lien was sought to be enforced on property described in the petition. The second note was paid before the filing of the suit. The petition alleged that in July, 1862, at Austin, the defendant, aided by the rebel authorities and R. J. Townes, who pretended to act at the time as provost marshal, did obtain the said note due thirteenth of March, 1862, from plaintiff by duress; that plaintiff was forced by actual and threatened imprisonment, and under his written protest, to take the Confederate States money tendered in payment for the note, and under like duress did surrender the note to defendant. Plaintiff asked judgment in coin and foreclosure of the vendor's lien.

The defendant by proper averments alleged—First, payments; second, payment in Confederate States money, accepted by plaintiff; third, avoided the duress by alleging a subsequent voluntary ratification; fourth, setting out fully the facts and averring the same to be a defense; and the further defense that at the time the Confederate States money was taken and voluntarily used by plaintiff, it was of value from eighty cents to par, as currency, and setting up the value in part payment.

The plaintiff introduced F. W. Chandler, who testified that he knew of the note described in the pleadings, and how it was attempted to be paid; that Harrell, the defendant, had obtained the note, and how it was obtained by him. About eleventh of July, 1862, at Austin, both Barnes and Harrell were at the provost marshal's office. Defendant wanted to pay the note in Confederate money. Barnes at the time refused to take it unless required to do so. Townes, the provost marshal, decided that if Barnes did not take the money in pay for the note, he would be imprisoned. Witness acted for Harrell. There were no guards or soldiers at the provost marshal's office, as witness remembered. Guards were frequent in those days—witness then remembered a Mr. Davis on duty on that day.

Witness had gone to the office for Harrell; saw the money counted to Barnes. It was given by Barnes to John T. Miller at the time. Witness recognizes a copy of the note, and it is read, being the same as set out in the petition. Witness recognized the paper as prepared at the time. Witness went to the office as the friend and adviser of Harrell; understood Barnes would be there. Witness saw at the office Joe Walker, John T. Miller and others; saw the money handed to Miller; heard Townes, the provost marshal, tell Barnes that if he did not take the Confederate States money he would put him (Barnes) in jail. Barnes then said he would take it under protest, rather than go to jail. The money was then handed by E. B. Turner (Barnes's at-

Statement of the case.

torney) to Miller, with request that it should be kept. Never heard Harrell say that Barnes was arrested or would be arrested on that day. Witness had been requested by Harrell to assist in settling the note, and a few days before the eleventh of July, 1862, witness went to Barnes's boarding house, to see him about the matter, but failed to see him. After this, witness told him that Harrell was ready to pay him in Confederate States money. Barnes then said he would not take it, if he could help it. Witness then told Barnes if he did not take it, he might be put to trouble. Witness told Barnes this on his own instance or impulse, and not by direction of Harrell. Witness was trying to settle the matter; witness was a lawyer. Witness cannot give Barnes's words at this conversation. He said in substance that he would not take it if he could help it. Sometime between this conversation at the blacksmith shop and the scene at the provost marshal's office, Barnes told witness that he (Barnes) would see Townes, (the provost marshal), or would see if he (Barnes) had to take it.

Witness saw Barnes at the provost marshal's office, and the money counted. The protest (meaning a paper prepared at the time by E. B. Turner, the attorney of Barnes) was read, and Townes said that if Barnes did not take it (the Confederate States money) he would be arrested or imprisoned. Barnes then took the money, and immediately after he or Turner handed the money to Miller, to keep it. Barnes afterwards told witness that he had gone and got the money from Miller. Witness cannot say how long this was after Barnes took the Confederate States money. Barnes told witness he had used all the Confederate States money he had got from Harrell but a fifty dollar bill, which he said was counterfeit; and he wanted witness to have Harrell take it back on that account. Harrell told witness that he would take it back if Barnes would make the necessary proof that he had got it from him (Harrell). Barnes several times

spoke to witness about the fifty dollar bill, which he said he had got from Harrell.

Plaintiff proved demand at maturity,

Joe Walker, W. Green, George H. Gray and W. H. Carr testified to being present and signing a protest by Barnes—Barnes had invited them to do so—several of them had been invited up by Barnes.

John T. Miller, called by defendant, testified : After reading the paper shown by plaintiff to the witnesses Chandler and others, recognizes his own name signed thereto; recollects the circumstances. It was in July, 1862, at Austin; only knows the date by the paper. The Confederate States money was put into his (witness') hands, either by Barnes or by his attorney, Turner. It was given to me to keep safe, they telling me to lay it away. Sometime after this, Barnes came and asked me for the Confederate States money, and I gave it to him. Barnes came and obtained from me the Confederate States bills handed me, he demanding it of me. The bills were mostly large—$100 and $50 bills. I rolled them up and marked on the package " A. H. Barnes," and put the package in the safe. At the time Barnes withdrew the said Confederate States money from me, there was no force or violence used or threatened. Barnes did it voluntarily.

Chandler recalled.

Barnes asked Townes if he must take the Confederate States money. Townes required him to do it. Turner, as the attorney for Barnes, handed the Confederate States money to Miller, with the request to keep it.

On the trial, after the witness John T. Miller had testified that in July, 1862, defendant Harrell had caused plaintiff to take the $1230 in Confederate States money, and that plaintiff had handed the same to witness, with statement that he had taken said Confederate States money under protest, and requesting witness (Miller) to keep it, and had further testified that plaintiff had come to witness and got the said Confederate States bills, the defendant

asked the witness Miller to state what was the value of the Confederate States bills at the time the same were handed by plaintiff, Barnes, to witness, and also at the time when they were returned to plaintiff, Barnes, by the witness.

To which plaintiff excepted, and upon exceptions the testimony was excluded.

And thereupon defendant asked the witness, Miller, whether the Confederate States bills, at the time Barnes had handed them to Miller, and when returned by Miller to Barnes, were of par value, and in business equal to gold and silver as a currency in Austin; which questions, and the testimony sought to be elicited, were excluded.

The witness, Miller, was also asked what Barnes said as to his reasons and purpose in taking back from him (Miller) the Confederate States bills, which was by the court permitted to be given by the witness; whereupon the witness answered "that plaintiff, Barnes, at the time, said that he had concluded to take the Confederate money and use it; that from the way things were going it looked like he never would get anything else, and that he would use it at what it was then worth," upon which the court excluded the testimony from the jury, as not tending to prove a ratification, and as tending to mislead and confuse the minds of the jury.

Defendant then offered to prove by witness, Miller, after he had testified that at the time plaintiff, Barnes, withdrew the said Confederate States bills from witness there was no force or violence used, or threatened; that plaintiff, Barnes, did it voluntarily; that there was no martial law in force in Austin at that time, and no other person claiming to act as provost marshal, which was excluded.

The court instructed the jury upon the defense of Harrell as follows: ·

"The treasury notes of the so-called Confederate States, usually called Confederate money, were not legal money, and had no value

whatever affixed to them by law, other than that which parties, by the course of their voluntary dealings between themselves, might attach to them; and only such value as may thus be voluntarily attached to them can be enforced by the courts.

2. "Where a party, by force and duress, compelled a creditor to accept payment in Confederate money, he thereby compelled him to accept a thing which, in and of itself was, in contemplation of law, of no value, and such creditor, under such circumstances, is not required to account for any supposed value which such notes may have had. In the absence of any voluntary agreement, express or implied, of the creditor, under such circumstances, that some value should be attached to such so-called Confederate money, he cannot be held to account to the party who forced him to receive them.

3. "Where a party, who is a creditor, is by force and duress compelled to take the treasury notes of the so-called Confederate States, usually called Confederate money, in discharge of a debt due him, and receives the same under protest, and at the time of receiving the same leaves or deposits it with another, subject to his order, the naked fact that he took the so-called Confederate money back from the party with whom he had deposited it is no evidence that he recognized and ratified the compulsory receipt of such notes, as a payment and satisfaction of his debt."

The defendant asked the court to instruct upon the equitable defense, as follows:

1. " That if the jury believe from the evidence adduced, that the plaintiff, Barnes, after taking the Confederate money from the safe of the depositary Miller, did, instead of persisting in rejecting it, and instead of tendering it back or returning it to defendant, Harrell, make use of it for his own purposes, and did even speak of only returning one fifty dollar bill of that money, they are at liberty to proceed upon the maxim, that he who would have equity must do equity, and that they may do what it was incumbent upon

the plaintiff, Barnes, to have done in the first instance; that is to say, they may credit and extinguish the note sued upon by the Confederate money proven to have been voluntarily accepted and converted."

4. "That the jury cannot find for the plaintiff, Barnes, unless they believe from the evidence adduced that he never voluntarily accepted, converted, or used the Confederate notes or bills, and that he has further, and before bringing this suit, tendered back said Confederate notes or bills to defendant, Harrell, so as to reinstate him, as near as may be, to the position he occupied when such notes or bills were first tendered in 1862, as in equity he was bound to have done."

The defendant asked the court to instruct the jury upon legal effect of the testimony; varying the instructions in several forms, and among the instructions, as follows:

3. "A payment, the taking of which was procured by duress by, or procured, by the payor, is not void, but only voidable; and is capable of ratification after the duress has been removed."

4. If the jury believe from the testimony that, although duress may have been used by defendant in procuring the note, and in making Barnes take the Confederate bills, that Barnes ratified the payment of the note, then they will find for the defendant."

And again, 8. "A payment in Confederate States money, if received under duress and under protest, would not be a valid discharge of the note, unless the party who had acted under duress ratified his acts done under duress after it was removed; and if the jury believe from the testimony that plaintiff, Barnes, after the duress was removed, did voluntarily take the said Confederate States money from Miller, with intent to take it as his own and to ratify the transaction had before the provost marshal, then such taking from Miller was as effectual to conclude Barnes from recovery as if he had voluntarily taken it in payment of the note when tendered at the provost marshal's office, in July, 1862; and the jury will find for the defendant."

Verdict of jury for amount of the note and twelve per cent. interest from maturity, and foreclosure of lien.

Motion for new trial, for reasons that the court erred in his instructions given, and in excluding those asked for defendant, and for reasons that the verdict was not in accordance with the testimony, and the error of the court in excluding testimony offered.

The motion was overruled, and the defendant gave notice of appeal.

*Bowers & Walker*, for the appellant.—The different assignments of error may be treated under the points :

1. In the court excluding the testimony of Miller, as to declarations of Barnes, on receiving back the Confederate States money, etc.

2. The charge given by the court. First, court will not attach any value to Confederate States money, save upon contracts. Second, court will not compel to account, etc. Third, that the sole act of taking the money not sufficient.

3. Refusal of judge to charge the jury. (*a*) As requested by Wm. Alexander, Esq., on equitable defense. (*b*) As requested by Bowers & Walker, on legal effect of the testimony—legal defense.

4. The judgment for coin.

I. The exclusion of part of Miller's testimony. The testimony showed that Barnes only took the Confederate States money when required to do so by Townes, the provost marshal. That he had been exacting in his demands of Harrell; had promptly demanded payment in coin to increase the rate of interest; had then refused payment in paper tender, Louisiana bank bills and Confederate States paper then a currency; had refused other good notes and refused to take back the property.

In the provost marshal's office, Barnes, on receiving the Confederate States bills, passed them over, by his attorney, Turner, to

Miller to keep. Turner and Barnes acted leisurely and made their own case; took time to write protest and gather up friends to witness it; and when the paper protest was ready and signed, the note was surrendered and the money under protest was received and handed to Miller to keep. The legal effect of Barnes's acts and declarations at the time was, that although compelled to take the Confederate States money, it (the Confederate States money) was nevertheless still Harrell's. He (Barnes) does not want the Confederate States money, and so hands it over to Miller in presence of those persecuting him with the money.

It is not necessary to justice, with this evidence showing that Barnes had changed his mind about this money, so as to want it, and so take it from Miller, to know what Barnes at the time gave to be his reasons for taking it away from Miller, Barnes saying that it was, from " the way things were going, all he ever would get, and he would take it and use it at what it was worth." Why not also let the jury know that when Barnes did this the duress from provost marshal and guards no longer existed, and that there nothing to fear; yet the court excluded this from the jury. It seems that a mere statement of the facts would show the propriety of the testimony, and the exclusion of these facts showed a disregard of the rights somewhat approaching the acts of the provost marshal.

It is insisted that the jury should have heard Barnes's statement, explaining why he took back the money from Miller, and that when this was done there was no provost marshal, or other authority for Harrell to appeal to, and that this paper then taken by Barnes had a value, and was of use to Barnes.

II. The charges of the court were erroneous.

Charge 1, given—that Confederate money is not legal money, and " only such value as may thus be voluntarily attached to them can be enforced by the court."

This is not law as given under any circumstances. Courts do

not enforce the voluntarily agreed value of Confederate money. (See the many Texas cases, declaring such void, only from public policy.)

When necessary to do equity between parties, and in contracts not directly for purposes of putting the Confederate States paper in circulation, the value is ascertained by testimony. (8 Wallace, 10, 11, Thorington v. Smith.)

Instruction two is wrong in requiring some express value as requisite for any consideration of the Confederate States paper, and is further partial in its effects, ignoring the facts in evidence.

Harrell is not seeking an account as complainant in a bill in equity. Harrell is not the actor; he defends, showing a contract; payment of the note on his part, and the surrender of the note by Barnes; an executed contract.

Plaintiff alleges that this contract was obtained by duress, and asks the court to avoid it and give relief.

Defendant avoids the duress by alleging subsequent voluntary ratification.

The charges would be good in the event that Barnes had never done anything with the Confederate States paper after he had given it to Miller.

It is admitted that neither Harrell nor Townes (the provost marshal) could affect Barnes's right in the note, nor did the act of Barnes in taking the Confederate States bills and under protest, and handing them over to John T. Miller, attach any ownership therein to himself; the act being done as to him under duress, was not binding; he could either ratify or disapprove the contract when the duress should be removed.

A contract entered into under duress is not void, but voidable, and may be ratified or affirmed after the duress is removed. (3 Par. on Con., page 395 and notes.)

After the removal of the duress, and when no provost marshal or other authority interfered, or existed to interfere, Barnes vol-

untarily goes to Miller, obtains the Confederate States money and uses it, as he told Chandler, Harrell's agent.

Application is made by Barnes to Chandler, the agent of Harrell, several times about one $50 bill, alleged to be counterfeit, and complaint is only made as to that one, and it only, because counterfeit. Certainly Harrell must have been led to think Barnes ratified the transaction by these statements. Either the Confederate States money or the note was Barnes's. He could not claim both. He deliberated which to choose. He determines that it is the best he can do, and selects the note.

Upon this statement of facts, the restriction of the proof to an express contract, and the disregard of the acts of Barnes as shown in second charge, was unjust to defendant. This is rather punishing the acts of Harrell and not administering the law upon the facts.

The third charge disregards the statute and charges upon weight of evidence.

The court had excluded evidence of Barnes's declarations that he took the Confederate States paper as the best he could do to use it. Although the testimony was in, that Barnes had reconsidered his refusal, and had taken and used it. Yet the court singles out one fact and charges the jury, that it is insufficient, when he well knew that other facts were in evidence, and that he had excluded other testimony on the subject. The charge was calculated to mislead the jury, inasmuch as only one fact was alluded to, and it was declared insufficient as a defense.

III. The instructions asked by and signed by William Alexander, of counsel for defendant, presents the case as an equitable proceeding on Barnes's part, to annul or declare void the transaction on July 11, 1862, before or in the provost marshal's office, and for relief. Coming into a court of equity he must first do equity. He asks that the contract be held void, yet refused to account for values received by him. He had taken the Confederate

States paper and had put it into circulation. Any judicial penalties arising from dealing in Confederate States paper by Harrell, had voluntarily been incurred by Barnes by taking and circulating it. The known maxim *in pari delicto*, etc., was refused. The jury were not allowed to consider the equities Barnes had subjected himself to by his own voluntary acts.

2. The other instructions asked sought to present in a legal view the facts in the case. Harrell had plead and proved facts tending to show Barnes's ratification of the contract.

He insisted that the law on contracts under duress, and on ratification shall be given. It is refused.

These instructions were presented in every form which counsel could invent, so as to avoid any formal defect in opinion of the judge.

The principles therein stated are law.

Contracts under duress are voidable, not void, and are susceptible of ratification. (3 Parsons on Contracts, 395 and notes; Broom's Legal Max., 201 and 679.)

In third charge asked by defendant and refused it was asked:

" A payment, the taking of which was procured by duress by, or procured by, the payor, is not void but only voidable, and is capable of ratification after the duress has been removed." (See 3 Parsons on Contracts, 395.)

4. " If the jury believe from the testimony that, although duress may have been asked by defendant in procuring the note, and in making Barnes take the Confederate bills, that Barnes ratified the payment of the note, they will find for the defendant."

And again, 8. " A payment in Confederate States money, received under duress and under protest, would not be a valid discharge of the note, unless the party who had acted under duress ratified his acts done under duress after it was removed; and if the jury believe from the testimony that plaintiff, Barnes, after the duress was removed, did voluntarily take the said Confederate

States money from Miller with intent to take it as his own, and to ratify the transaction had before the provost marshal, then such taking from Miller was as effectual to conclude Barnes from recovery, as if he had voluntarily taken it in payment of the note when tendered at the provost marshal's office in July, 1862, and the jury will find for the defendant."

The judge refused to allow the jury to consider the question of ratification, totally excluding everything about that subject.

It is scarcely necessary again to revert to the testimony of Miller and Chandler, on the subject of the acts of Barnes in taking and using the Confederate States money, all of which was excluded from the consideration of the jury as a defense.

The principle acted on by this court upon Confederate States money contracts is to refuse to enforce an executory, or to rescind an executed contract. (30 Texas, 754, McCartney v. Greenway; 30 Texas, 753, Reavis v. Blackshear.)

In the case of Ransom v. Alexander, 31 Texas, 445, it is clearly recognized that a payment to an agent in C. S. paper could be ratified.

In this case the owner of the note never received the money until 1866, when it was worthless. He then took it back and tendered it (the Confederate States paper) to the payor, and demanded the note.

He never used the paper as did Barnes, as he told Chandler. He never determined to use it at what it was worth, as he told Miller he had concluded to do.

The case of Thorington v. Smith, 8 Wallace, already cited, shows that the courts may ascertain the actual value of the paper when necessary to do equity between parties. It was proposed to show, in the case at bar, that the Confederate States paper, when taken from Miller to be used, was of par value; that it did in fact have an actual value in the purchase of property and payment of debts.

Again, the contract between Barnes and Harrell was executed, if a contract at all. It was ratified by Barnes, when all duress was removed, in taking and using the Confederate States bills. He never, as in the case in 31 Texas, tendered back or sought a cancellation. Being executed, it is against principle and authority to cancel it.

IV. The coin judgment.

This was wrong. The note became due subsequent to the time the legal tender law went into force.

This court has sustained the legal tender law, and there is no doubt as to its legality as to future contracts.

The decision of the United States Supreme Court has only extended to the contracts matured, and so with rights vested, prior to the twenty-fifth of February, 1862.

*E. B. Turner*, for the appellee.—The main defense below was made upon the idea that if defendant was not fully discharged by the payment in Confederate notes, he was entitled to a credit for the actual value thereof. I do not propose to discuss the proposition that a man may compel another to deal in an unlawful thing, and because a band of men engaged in rebellion force that thing upon a community and compel people to give to it an estimated value, that the courts of the country, when order is restored, will compel that same recognition by giving value to the same thing. This would be the same in character as was the act of the provost marshal of the Confederacy, only differing in degree ; and financially considered, I would as soon be compelled to take Confederate money by the use of the bayonet as by the courts, and for the sake of propriety and justice, much rather. I, therefore, cite a few adjudications and dismiss this branch of the case. (See Pridgeon v. Smith, 31 Texas, 171 ; Goodman v. McGehee, 31 Texas, 254 ; Ransom v. Alexander, 31 Texas, 443 ; Boone v. State, 31 Texas, 557 ; Levison v. Norris, 30 Texas, 713 ; Levison v. Krohne, 30 Texas, 714 ; Kleberg v. Bonds, 31 Texas, 611.)

I anticipate the main point that will be urged here is error in rendering judgment for coin. I have no fears of a reversal upon this ground, because the declaration in Jones v. McMahan, 30 Texas, 734, that such addition is mere surplusage, would prevent more than a reformation of the judgment; also see Healy v. Flourney, 31 Texas, 590.

Believing, however, as I do, that the judgment, as it stands, is defensible and should be enforced, I propose, most respectfully, to give my reasons for so believing, notwithstanding the rulings of this court tending in the other direction.

Believing that this court will feel more pride in being right than in being uniform in its decisions, I shall refer to the cases that have preceded this, with all due respect to the court, and at the same time confidently ask a reconsideration.

My faith in the justice of the judgment as it now stands springs from an innate principle, implanted, felt and enjoyed in every human heart, and no philosophy can tear away this conviction whilst the soul of man is in communication with its divine author.

My legal justification for the faith that is within me is vindicated in the case of Hepburn v. Griswold, 8 Wallace, 604.

The law making paper money a legal tender is a law passed by the Congress of the United States. The Supreme Court of the United States has a peculiar right to interpret and construe those laws, and to declare whether or not they are in conflict with the Constitution of the United States. The Constitution of the United States, article 6, section 2, reads as follows :

" This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges in every State shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."

To a conscientious observance of this law the country must look

for quiet and repose.  Our recent troubles have no doubt taught the thoughtful a lesson upon this point.  I do not refer to it because I question the readiness of this court to yield its hearty assent, but because the proposition lays directly in the path I am called upon to travel.

There is another provision of the same instrument that it is proper to quote—article 1, section 10, general provisions; the same provision is now found in our State Constitution in Bill of Rights, section 14 :

"No State shall make any law impairing the obligation of contracts."

This last provision, it is true, is an inhibition upon the State Legislatures, but it was inhibited to them because of the injustice necessarily flowing from such a law ; and we cannot suppose that the Congress of the United States could violate this just principle without violating the spirit of that instrument.  Upon this point the court is referred to the opinion of the Chief Justice of the United States in Hepburn v. Griswold above cited.

This court has not, up to the present time, had before it the case of Hepburn v. Griswold, and we doubt not if it had, it would at once have adopted the rule of the decision of the Supreme Court of the United States, whatever might have been its individual views upon this subject.  The course to be observed is clearly laid down in Jones v. McMahan, 30 Texas, 734, 735.  Again the court affirms the same purpose and lays down the same rule as governing it in Keach and Williams, decided in Galveston in 1870.  In that case the question was : What is the legal obligation of a contract payable in Confederate money ?  And notwithstanding the case of Thorington v. Smith, decided in the Supreme Court of the United States, had authorized the value of Confederate notes to be estimated at their current value, this court refused to follow the line of decisions adopted in that case, and says : " Were the question one affecting and contrary to the validity of a treaty or

a statute, or authority exercised under the United States, we should be bound to yield our opinions to that of this high tribunal, for the protection of the national jurisdiction, and to prevent collision between State and national authority, and to promote that harmony that should exist among judicial tribunals; but as the Supreme Court of the United States has not appellate jurisdiction in this case," etc. That in the case now under consideration the Supreme Court of the United States has appellate jurisdiction is fully established by the case of Hepburn v. Griswold, as that was an appeal from the State Court of Kentucky upon this very point.

The law then is determined by the decision of the Supreme Court, and we may now say the law in respect to legal tender does not reach back and include contracts entered into before the passage of that act. We know this, because such is the decision of that court, whose peculiar province it is to determine that question, and to that construction this court will yield its cheerful assent.

The Supreme Court of the United States, upon a rule of property arising in this State under our local laws, observed this rule of comity and necessity to the extent of overruling its own decision. (See Suydam v. Williams, 24 Howard, 432, 434; Jackson v. Chew, 12 Wh., 162; Beauregard v. New Orleans, 18 Howard, 497; Arguillo v. United States, 18 Howard, 539; League v. Egery, 24 Howard, 265, 266.)

These decisions may well make us proud of our judiciary, who so readily yield their own views and opinions whenever that comity spoken of by Judge Morrill, in the case of Keach v. Williams, above cited, renders it necessary.

The case of Hepburn v. Griswold places all contracts, whether due before or after the passage of the act of February 20, 1862, upon the same footing, which saves any question in this case about the rule being different when the note falls due after the passage of that act.

We now call attention of the court to the case of Vanalstyne v. Sorley, decided at Galveston in 1870. In that case this court reversed and reformed the judgment, because the judgment was for coin; but in so doing it distinctly announced the principle upon which it done so, and it specifically declares that "although the Supreme Court of the United States is the authoritative interpreter of the act under consideration," and had decided in the case of ——— v. ———, that contracts specifically payable in gold can be enforced, "But it will not be presumed in advance that that court will pronounce a like opinion in reference to similar contracts entered into after the enactment of the law," etc. It will thus be seen that this court is committed to no rule that shall demand of it to insist upon its own decision upon the point in issue, provided the Supreme Court should entertain a different view from that adopted by this court. I now present this court with a decision that settles the law to be, that in this case my client is entitled to have his judgment specifically enforced as it now stands.

The first case to which I may be referred is Shaw v. Trunsler, 30 Texas, 390. In that case the contract was made after the passage of the legal tender act, and is not therefore in exact analogy, and the case was reversed because the pleadings did not lay the foundation for the introduction of testimony showing the commercial difference in the values. This being the point of reversal, the balance that is said is but dictum, although I admit the judge delivering the opinion cannot well be misunderstood in regard to his individual views had the pleadings been ample. Still the ruling is only authority upon the point involved in the case, and that was one of the pleadings. I leave the moral question to the discussion of the very able and excellent judge who delivered the opinion in Shaw v. Trunsler, and the Chief Justice of the United States who delivered the opinion in Hepburn v. Griswold.

In the case of Alford v. Killough there was really no question of legal tender in the transcript; the decree was for a sale for cash;

XXXIV—27

the defendant below appealed, and the defendant in error in the Supreme Court insisted that the decree should be reformed and judgment rendered for gold; and this, so far as the case shows, without any other thing appearing in the record than that the note was payable in coin. This demand on the part of the appellee was refused and the judgment affirmed. What the pleadings were does not appear, nor does it appear that any issue was made or controversy had in the court below upon the point; and I submit that under such a state of case, what may have been said by the judge delivering the opinion in that case by way of parenthesis, should not be regarded as in any way affecting the point in issue here, nor shake in the least the oft repeated declaration of this court to follow the line of decision in all such cases as should be adopted by the Supreme Court of the United States; and especially as in the case of Alford v. Killough this court made no decision in conflict with those of the United States court.

There is no State in the Union where the courts do not recognize the doctrine so oft repeated by this court, viz.: assent to the binding force of the laws of the United States, and of that portion of the Constitution of the United States to which I have called attention. That it is the only true rule, there can be no doubt. That Congress has the right to enforce it, there is no need to discuss. That this court has at all times proclaimed its readiness to accept the interpretation of any act of Congress which shall be given by the Supreme Court of the United States, I have fully shown. That such has been the rule through all the past years may be ascertained by careful research, and having now for the first time, so far as I know or believe, to pass upon the effect of the legal tender act upon contracts which ante-date the legal tender act since the publication of Hepburn v. Griswold, I will not attempt arguments to convince this court that it should follow that decision; as it would do violence to my own feelings, and argue my want of confidence in the virtue of this honor-

able court.  I have shown what the law is, and if before there were differences of opinion and doubt, they will all yield in deference to the high authority of the Supreme Court of the United States, which is the authoritative interpreter of all the laws of Congress, and to the imperative command of the Constitution of these United States.

OGDEN, J.—In March, 1870, the appellee obtained a judgment in the District Court for Travis county against the appellant, for the sum of $2150, the amount due on a certain promissory note, dated April 13, 1860.  From this judgment the defendant below has appealed to this court.

The execution and delivery of the note sued on were not controverted, but the defense set up in the district court, and now claimed to be sufficient to require a reversal of the judgment, is payment in Confederate notes, or money, as it was called at the time of the pretended payment.

The facts, as disclosed in the pleadings and evidence on the trial, may be thus briefly stated.  The note sued on became due in April, 1862, when payment was demanded by appellee, the holder and owner of the note, and payment was tendered in Confederate money, and perhaps some Louisiana bank bills.  This tender was refused by the appellee, and the appellant then sought and obtained the aid of the then provost marshal of the Confederacy, to compel the acceptance of Confederate money in payment of the debt, and the surrender of the note.  The parties were brought before the provost marshal, and were accompanied by their attorneys and witnesses ; and there the appellee was solemnly informed that he must receive Confederate money for his debt, and surrender his note for cancellation, or go to jail.  And in order to preserve his liberty and to avert the indignity of imprisonment, he accepted the Confederate money and surrendered his note, under a verbal and written protest.  And now the appellant claims that he is in

law, and especially in equity, entitled to a discharge from his debt, or at least to a credit for whatever the Confederate money was worth at that time.

If such an outrage to the intelligence, freedom and rights of man, a disgrace alike to this people and age, can call forth the equitable powers of a court, then we confess we have never known what equity is. To force from a person, through fear or by brute power, his property, or the evidence of his property, is robbery, and to compel another to participate in treason, or to accept the fruits of treason, is a three-fold crime, for which our laws or language have no adequate terms of condemnation. But when a party comes into a court of justice, and demands the fruits or results of all these crimes combined, as a peculiarly equitable relief, we must most respectfully refer him to that tribunal which compelled the appellee to receive treasonable paper for a just and honorable debt. We are of the opinion that there is no error in the judgment of the district court, in so far as it gave no credit for Confederate money received by appellee under compulsion.

There is, then, but one other question raised by the pleadings in this cause which it is deemed necessary here to notice. The note sued on was executed in April, 1860, two years before the act of Congress making certain paper money a legal tender for all debts and demands between individuals. At the time the note was executed, " it had reference to coined money, and could not be discharged, unless by consent, otherwise than by tender of the sum due in coin," (Hepburn v. Griswold, 8 Wallace, 608,) and, therefore, the note called for coin as specifically as though it said so on its face; and it is maintained that neither this court, nor any authority of the State, has any power or authority in any manner to change or impair the obligations of contracts. This power is reserved from the States by express provision in the Constitution of the United States, and if the courts of this State should exercise any such authority, it must be by virtue of some law of the

United States, and not by virtue of any State law. We think it will not be contended that a note, made payable in coin, can by law be discharged in currency worth fifty, seventy-five or ninety cents on the dollar, without impairing the obligation of that contract; and, if so, then there is no authority in the States to pass any such law, nor in the courts of the States to execute such a law, should such a one be passed. It therefore cannot be questioned that this note, payable, as it was when executed, in coin, can be discharged in anything else, unless there is some law of the United States authorizing the same.

The question whether, under the laws of the United States, a note payable in February, 1862, in dollars could (subsequent to the passage of the legal tender act) be discharged in the paper currency of the United States, came before the Supreme Court of the United States in the case of Hepburn v. Griswold, reported in 8 Wallace, 603, and after a most thorough investigation, it was decided that the act of Congress passed in February, 1862, known as the legal tender act, so far as it affected pre-existing debts, was unconstitutional, and that therefore all notes executed before that date were payable in coin, and could be discharged in coin only. The case of Hepburn v. Griswold was taken from the Supreme Court of Kentucky, by writ of error, to the Supreme Court of the United States, demonstrating the fact that the United States Court has a revisory power over this court; and as was said in Jones v. McMahan, 30 Texas, "because a writ of error will lie to the Supreme Court of the United States in this case, should we decide adversely to this construction of the Constitution and laws of the United States, we are bound to obey its decision as our superior." Therefore, according to the authority of the case referred to, we feel authorized to decide that the court did not err in rendering a judgment for coin; and there appearing no other error on the record to require a reversal of the judgment of the district court, it is affirmed.

Affirmed.

EVANS, P. J.—This note which is the foundation of this action fell due in April, 1862.

Harrell tendered the amount of principal and interest in Louisiana bank bills and Confederate money, but Barnes demanded gold and silver. As the note stipulated for twelve per cent. interest, after demand of payment, Barnes was careful to entitle himself to this interest by making the demand; while Harrell was anxious to discharge the note and so relieve himself from such high rate of interest.

This was in Confederate times, when there was a great scarcity of the precious metals in circulation, and Confederate money and the depreciated paper of the Louisiana banks formed almost the only currency in circulation.

This currency Barnes did not want, and insisted on the payment in good money, in accordance with the terms of his contract.

Harrell appealed to the provost marshal; who, in accordance with an order issued by the commanding officer of the military district of Texas, assumed jurisdiction and ordered that Barnes receive the depreciated currency and deliver the note to Harrell for cancellation.

Whether a provost marshal, under the authority of the Confederate Constitution, could rightfully exercise jurisdiction over the parties and the subject matter in controversy, we do not propose to inquire; but we may safely say that it was not within his competence to impress upon depreciated paper currency the value of gold and silver.

The law of values is forever above the reach of governmental power.

This Barnes very well knew, and so received the paper under protest, and deposited it with one John T. Miller, with a view of repudiating the action of the provost marshal, and of recovering the value expressed in the contract, should circumstances prove favorable.

But Barnes afterwards changed his mind, and used the money at what it was then worth. At what rate of discount, or what Barnes received in its use, the record does not disclose, as Harrell was not permitted by the court below to prove the value of Confederate money at that time. We know, historically, however, that it ranged at about $33\frac{1}{3}$ per cent. discount. Barnes voluntarily used this depreciated paper, and· must have realized about $600 from it, and this amount must be considered as having been received in part payment of his claim upon Harrell, and for which Harrell is entitled to credit upon every principle of reason and of justice.

For, why should this court compel Harrell to pay over to Barnes six hundred dollars that he had already received some nine years ago? To punish Harrell for treason? If so, why put the fine into the pockets of Barnes, who was alike implicated with him in treason? Shall this court, in a civil controversy, undertake to discriminate as to the degrees of guilt of parties for participation in rebellion, or shall it allow its just hatred of treason to influence its decisions according to the degree of the supposed guilt or innocence of the parties before it?

Both Barnes and Harrell were citizens of the Confederate States. The allegiance of both to the United States government had been suspended, and transferred to the new political power which had arisen in the Southern States, and which then, and for three years thereafter, controlled the destinies of this country. This political power had established a government regular in its form, both civil and military, and to this government society looked for protection. It could look to no other.

The provost marshal with his guard was an arm of the government, deemed' essential to the preservation of peace and order in society, and his official acts, performed within the scope of his authority, were as valid as were the acts of any civil officer. And had the official orders of the provost marshal in this very transac-

tion come before the Supreme Court of that day for review, they would doubtless have been upheld as valid and binding; and we, perhaps, should have had in the volume of reports an opinion from that able court affirming the regularity of the whole proceeding.

The provost marshal compelled Barnes to receive $1230 in depreciated paper currency, but this did not extinguish the debt. For Barnes may have kept the paper until it became utterly worthless, and upon the re-opening of the courts after the termination of the military government, have demanded the full amount of his note, principal and interest. But he did not so act; for he used the money at its then value in the market, and received therefor in value about six hundred dollars. His act in passing off this money charges him with whatever responsibility may attach to the circulating of Confederate money.

The issuance of paper money to circulate as a medium of exchange was one of the necessities of the times, demanded by the interests of society. To buy and sell, and to exchange commodities, is as essential to the well-being of society as to plant and reap. To receive and pay out Confederate money was, then, one of the imperious needs of society, and nothing of immorality or crime can therefore attach to any act of receiving and paying it out.

Whether that form of paper money was well adapted to the ends intended, we can now answer, from the light of a better experience, that it was not—that it proved a great misfortune instead of a blessing to the people. Still it was the only currency available, and to receive and pay it out, in obedience to the wants of society, was no more treasonable than to receive and consume one's daily food.

Barnes committed no crime in using the $1230 of Confederate money. But to appropriate six hundred dollars which he received for this Confederate money, and not allow Harrell credit for it, would be unjust, and on a par with Harrell's act in endeavoring to discharge a debt in depreciated currency.

Both Barnes and Harrell should be required to obey the rules of common honesty and fair dealing.